IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | Criminal Action |
| v. | No. 13-cr-60-1 |
| MARCUS AKIEM RICKETTS, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

**GOLDBERG, J.**                                                                                           **January 10, 2024**

Defendant Marcus Akiem Ricketts has moved to set aside his conviction and sentence under 28 U.S.C. 2255 based on alleged constitutional violations. Ricketts alleges his trial counsel provided constitutionally deficient assistance by failing to file a motion to suppress evidence, and also claims that his guilty plea was coerced through emotional pressure by members of his family. A hearing was held on August 26, 2022, wherein Ricketts was represented by appointed counsel, and the parties have now filed supplemental briefs addressing Ricketts's claims. For the reasons set out below, Ricketts's motion will be denied.

**I.     FACTS**

On June 3, 2014, Ricketts pled guilty to four counts of armed bank robbery and one count of using or carrying a firearm during a crime of violence. (N.T. 6/3/14 at 3:21-4:17.) The facts underlying Ricketts's § 2255 motion primarily concern the last robbery, of an M&T Bank in Exton, Pennsylvania on July 2, 2012. Ricketts argues that police officers who arrested him and searched his car following his flight from the M&T Bank violated his Fourth Amendment right to be free

1

from unreasonable searches and seizures. The following facts are taken from the August 26, 2022 hearing, wherein Ricketts, his trial counsel Maria Pedraza, and his mother Paula Corson testified, as well as from exhibits introduced at the hearing.

### A. Flight from the M&T Bank

Ricketts and his counsel prepared a diagram showing Ricketts' flight from the M&T bank, depicted below. Point "1" in this diagram is the M&T bank and "3" is where Ricketts parked his car:



(Ricketts's Exhibits page 388.)

As Ricketts fled the M&T bank, he walked to his car through a "wooded area" ("4"). At that time he was wearing sweatpants, sneakers, a gray t-shirt over a long-sleeved blue shirt, sunglasses, and a book bag. When he arrived at his car, he changed his clothes, then started the car and pulled out onto Andover Drive. He soon spotted a police car with its emergency lights on, leading him to pull into the driveway of a house on Andover Drive ("5"). (N.T.[1] 33:6-19, 34:2-9, 39:18-21.)

---

[1] Citations to "N.T." without a date refer to the hearing on Ricketts's § 2255 motion.

Ricketts exited his car and walked toward the front door of the house, pretending to live there. The officer exited her police car and started to talk to Ricketts, then ordered him to the ground. Ricketts was arrested and his car searched pursuant to a warrant. (N.T. 34:10-15, 42:16-43:1; Police Criminal Complaint (Rickett's Ex. D-3, Attachment 1); Search Warrant (D-3, Attachment 3).)

Exhibits introduced at the evidentiary hearing show that the arresting officer, Diane Ahern of the Uwchlan Township Police Department, wrote four accounts of the above events. In a short "Incident Report Form" (Rickett's Ex. D-3, Attachment 2, N.T. 13:17-19), Officer Ahern gave an account substantially consistent with Ricketts's testimony described above. In a longer document also titled "Incident Report Form" (D-3, Attachment 3), she added several details that do not appear in her earlier report. For example, Officer Ahern wrote that before spotting Ricketts in his car, she saw a "light blue shirt in the wooded area"—apparently referring to the patch of trees between the M&T Bank and Ricketts's car (point "4" on the map). Officer Ahern also added that she observed Ricketts in his car wearing the same light blue shirt—despite that Ricketts claims to have changed his clothes between these times. And she wrote that Ricketts "aggressively" pulled out of the dead-end street.

In an affidavit of probable cause attached to a "Police Criminal Complaint" (D-3, Attachment 1), Officer Ahern expanded on her observations of the "wooded area" to add that she "caught a glimpse of a black male[] wearing a blue shirt." In contradiction to her prior two accounts, the Police Criminal Complaint now stated that Ricketts was "ordered out of the car" as opposed to exiting voluntarily. Finally, in a fourth account, Detective D'Ginto swore out an affidavit of probable cause in support of a search warrant for Ricketts's car (D-3, Attachment 3). Largely relying on Ahern's observations, D'Ginto repeated the statement about observing a light

3

blue shirt in the "wooded area" but reverted to the story that Ricketts voluntarily exited his car rather than being ordered out.

**B.     Criminal Prosecution**

Ricketts first retained Christian Hoey to represent him in July 2012. On October 16, 2013, Ricketts requested new counsel, and Maria Pedraza of the Federal Defenders Association was appointed. Ms. Pedraza worked with another attorney in that office, Kai Scott. (N.T. 8:25-9:2, 9:6-11, 72:14-21.)

Ricketts's defense was complicated by the fact that he had given a proffer to state law enforcement in which he admitted to the robbery of the M&T Bank. Ricketts had also provided a proffer to federal authorities wherein he admitted to 11 bank robberies, all at gunpoint. (N.T. 43:8-12, 44:2-8, 44:12-13.) Ricketts gave these proffers before Ms. Pedraza came onto the case, and he does not argue that he received inadequate representation by prior counsel, Mr. Hoey. (N.T. 87:10-13.)

For Ricketts, the "most favorable outcome" from Ms. Pedraza's representation would have been a "plea deal with a reasonable amount of time." But the Government's offer—25 years—was not reasonable in his view, and in fact he thought it was "outrageous." (N.T. 10:3-12, 55:5-6, 77:4-12.) Although Ricketts never professed his innocence, he wanted to go to trial if he could not obtain a plea deal that he considered reasonable. He understood that, were he to do so, he would likely be found guilty and face a prison sentence well in excess of 50 years. (N.T. 10:13-15, 51:8-13, 50:8-13, 59:20-25, 77:6-8.)

On May 28, 2014, one week before the scheduled trial date, a status hearing was held, wherein Ricketts proclaimed he still wanted to go to trial. (ECF No. 45; N.T. 15:14-23.) According to Ricketts, in the week following the status hearing, Ms. Pedraza tried to convince him to plead guilty, and they discussed the topic of a plea deal "almost exclusively." (N.T. 16:13-15, 17:5-11,

4

24:16-18.) According to Ricketts's counsel, she had engaged in plea negotiations but was ultimately unable to obtain a better deal than 25 years, and believed it would be "unnecessary and sad" for Ricketts to go to trial, be found guilty, and be sentenced to longer than 25 years. (N.T. 87:3-6, 87:14-23, 89:1-3.)

### C. Possible Suppression Motion and Counsel's Decision Not to File One

Ricketts points to facts that he contends would have provided grounds for a suppression motion related to the items found in his car. First, Ricketts notes that the officer's statement that she saw a "black male" in the "wooded area" could have been rebutted. According to Ricketts, it was not possible to walk from the M&T Bank to Andover Road without encountering obstructions. (N.T. 26:16-20.) In particular, his flight took him between a fence and the woods to get around some dumpsters, a location that was obscured from the driveway where Officer Ahern claimed to have pulled out onto Andover Road. (N.T. 26:24-27:1, 30:7-20, 30:24-31:9.) A series of photographs depict the "wooded area" where the officer allegedly spotted Ricketts, several of which reveal dense shrubbery that would arguably be difficult for an officer to see into from the parking lot, especially around the dumpsters where Ricketts claims he walked. (E.g., Ricketts's Exhibits, pp. 172-78, 180-82; N.T. 28:6-17.) Ricketts also notes that Officer Ahern omitted her reference to spotting a suspect in the wooded area from an earlier incident report, an oversight Ricketts characterizes as implausible given its importance. (See Incident Report Form.)

Next, Ricketts argues he could have refuted—through his own testimony—the officer's statement that she observed Ricketts "aggressively speed out of" the dead-end street where he parked his car. (See Police Criminal Complaint.) Ricketts claims he did not speed out of Windsor Circle but was driving "legally and carefully to not be suspicious." (N.T. 41:1-3.)

Third, Ricketts points to a contradiction between two of the officer's statements: in an affidavit of probable cause contained in the Criminal Complaint, the officer stated that Ricketts

5

was "ordered out of the car," yet in an incident report, the same officer stated that Ricketts "got out of the car." (Police Criminal Complaint; Incident Report Form.) Ricketts contends that this latter version is what really happened. (N.T. 34:16-17, 42:16-43:1.) Based on all of these inconsistencies, Ricketts maintains that it was error not to file a motion to suppress the results of the search.

Trial counsel reviewed the officer's statements and heard Ricketts's view that the officer was lying. (N.T. 12:5-7, 69:5-11, 83:4-6, 83:19-21, 84:6-18.) According to Ricketts, he asked trial counsel if she would file suppression motions and she told him she would. (N.T. 11:11-16.) Counsel testified that she considered filing a motion to suppress and decided not to. (N.T. 70:3-8.) Her decision was based on: (1) her understanding about whether such a motion would be viable; and (2) the risk of interrupting plea negotiations or prompting the Government to withdraw its 25-year offer. (N.T. 69:12-70:2, 90:25-91:4.)

As to viability, counsel determined that Ricketts could not safely testify at a suppression hearing without risking additional on-the-record admissions, which were already substantial. That would leave the officer's statements uncontradicted. (N.T. 73:8-23, 74:8-11, 76:4-8, 86:19-21.) Although photographs could have contradicted the officer's testimony about her observations in the wooded area, counsel believed that other, uncontradicted facts could have supported probable cause for the traffic stop and arrest. Thus, counsel did not view a suppression motion as likely to succeed. (N.T. 73:24-74:7, 75:13-20, 76:1-2, 86:1-7.)

Counsel was also concerned that litigating a suppression motion could "jeopardize" plea negotiations. (N.T. 88:6-10.) Due to the mandatory minimums associated with the § 924(c) charges, obtaining a 25-year deal was contingent on the Government dismissing certain charges, and litigating a suppression motion would reduce the Government's incentive to do so. (N.T.

6

88:12-25.) The Government had already exercised extraordinary discretion in keeping the 25-year offer open until jury selection, and the Government's attorney had reminded Ricketts's counsel that the offer would be "cut … off" at some point. (N.T. 89:12-90:1.) Based on all these considerations, trial counsel opted not to file a motion to suppress.

D.    Counsel's Solicitation of Ricketts's Family's Views

Prior to the plea hearing being held, Ricketts's trial counsel, Ms. Pedraza, spoke to Ricketts's mother and expressed concern about Ricketts's continued desire to proceed to trial. Ricketts knew his counsel was talking to his mother and did not "have a problem with that." (N.T. 17:12-16, 77:21-24.) Trial counsel and Ricketts's mother characterized these communications slightly differently. According to counsel, she asked Ricketts's mother to provide something to "show Mr. Ricketts that there was hope that he wasn't alone, that people were going to stick by him, that people were interested [in] being a part of his life and having him be a part of their lives." (N.T. 78:3-9.) Ricketts's mother, by contrast, testified that counsel asked her to obtain letters from friends and family "trying to persuade him to take the deal." Ricketts's mother did not directly answer whether she "agreed" with this plan, but testified that she was upset and did not want Ricketts to spend the rest of his life in prison. (N.T. 97:10-22, 98:1-7.)

At counsel's urging, Ricketts's extended family (and one friend) sent emails addressed to Ricketts reminding him that he was loved and urging him not to spend the rest of his life in prison—i.e., to accept the Government's 25-year offer rather than receive an even longer sentence after a trial. The emails used strong emotional language, such as: "Please allow us to see you, hug you, laugh with you, argue with you, receive threats to fight with you, cry with you, did I say laugh with you and share this walk with you… On the outside" and "Your mother and the rest of our family are heartbroken over the fact that you seem to be content in staying in prison the rest of your life." (Ricketts's Exhibits, pp. 10-11, 14.) Trial counsel described these messages as

"encouragement" and believed they made "perfect sense" under the circumstances. (N.T. 92:4-13.) To Ricketts, they were "very emotional, upsetting." Yet he understood that his family members wanted him to plead guilty so that he could have a life outside of prison. (N.T. 20:3-5, 31:18-22.)

In addition, trial counsel arranged for Rickett's mother to be in court on the day of jury selection and for Ricketts to speak with her privately outside of counsel's presence. (N.T. 18:24-19:1, 79:3-10.) When Ricketts came to court on June 3, 2014, he expected to proceed with trial, as did his counsel. He told his mother that he had "prayed on it" and was "at peace" with his decision to proceed to trial. (N.T. 17:20-22, 18:21-23, 78:24-25.) After talking to his mother and seeing his family's emails, Ricketts told his counsel that he wanted to plead guilty. This option was still available to him because the Government had agreed to leave its offer of 25 years open until jury selection. (N.T. 21:10-12, 80:6-7.)

### E. Guilty Plea

Ricketts's trial counsel provided him with a plea agreement and explained it to him, and Ricketts accepted it without "hesitancy, … reservations, … [or] unwillingness." (N.T. 22:10-13.) In his under-oath plea colloquy, Ricketts stated that no one had "force[d]" or "threaten[ed]" him to plead guilty and that he made the plea "voluntarily" and of his "own free will." (N.T. 6/3/14 at 9:2-7.) Ricketts later reaffirmed these statements, agreeing that, at the time, he did not believe he had been coerced and that pleading guilty was what he wanted. (N.T. 24:19-20, 62:6-8.)

Ricketts's feelings about his guilty plea started to shift when he took a legal course in prison and understood how, in his view, people can be manipulated into thinking a decision is their own when it is not. Now, Ricketts's position is that his guilty plea was coerced. He attributes his prior acceptance to his lack of understanding that "me wanting something and someone changing that for me wasn't necessarily me wanting that." (N.T. 23:24-24:1, 24:3-5, 61:10-15.)

Based on this evidence, Ricketts moves to set aside his conviction and sentence.

## II. LEGAL STANDARD

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "The petitioner bears the burden of proof under § 2255 and must demonstrate his right to relief by a preponderance of the evidence." Kinchen v. United States, No. 19-cr-00148, 2023 WL 4471509, at *1 (M.D. Pa. July 11, 2023).

## III. DISCUSSION

### A. Ineffective Assistance of Counsel Based on Failure to Move to Suppress Evidence

The Sixth Amendment provides criminal defendants with the right to effective assistance of counsel, a right that "extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). To make out a claim for the denial of effective assistance of counsel, a defendant must show that counsel's "performance was deficient" and that counsel's deficient performance caused prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). Defense counsel's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. "[T]he proper standard for attorney performance is that of reasonably effective assistance." Id. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. The defendant must rebut the presumption that counsel's conduct "might be considered sound trial strategy." Id.

Ricketts argues that counsel did not act within the bounds of reasonable professional judgment when she declined to move to suppress evidence gained from the search of his car. Ricketts suggests two grounds on which evidence could have been suppressed: (1) the initial traffic stop was unlawful; and (2) the search warrant would have been shown to be deficient at a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (permitting a defendant to raise factual challenges to a warrant affidavit). Ricketts points to: (a) the contradictions in Officer Ahern's statements about whether Ricketts was ordered out of his car or exited voluntarily; (b) Officer Ahern's purported inability to identify him as the robbery suspect based on height, weight, and skin color alone; and (c) photographs showing that the officer could not have observed him in the "wooded area" behind the M&T Bank as claimed. Counsel did not pursue a motion to suppress based on any of these grounds.

Ricketts does not argue that trial counsel lacked adequate information to make an informed decision about whether to file a suppression motion or that counsel should have visited the scene to check the accuracy of the officer's description or asked Ricketts additional questions about what occurred. Ricketts also does not suggest that counsel should have researched additional authority. Trial counsel testified that she was aware of Franks, which Ricketts did not dispute, and I find counsel's testimony credible. Nor does Ricketts contend that counsel acted on an inappropriate motive, such as to limit Ricketts's options with respect to trial.

Instead, Ricketts challenges only trial counsel's ultimate judgment that filing a suppression motion was unsound strategically. Ricketts faces a heavy burden on this claim because "strategic

10

choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable … ." Strickland, 466 U.S. at 690. I conclude that counsel's decision was well-supported for the following reasons:

First, trial counsel was reasonably concerned about the consequences of Ricketts making further admissions on the record. To contradict the officer's statements, Ricketts would have had to admit that he walked through the wooded area behind the M&T bank to his car parked on a dead-end street, where he then changed clothes—all damaging admissions. Absent Ricketts's testimony, Officer Ahern's statements that she saw Ricketts aggressively speed out from a dead-end street behind a bank soon after a robbery would have stood uncontradicted. (See Affidavit of Probable Cause, Exhibit 3 in response to ECF No. 89.) It was not unreasonable for counsel to predict that a court would find this to constitute reasonable suspicion even absent further identifying details such as Ricketts being in the "wooded area." See United States v. Scott, 816 Fed. App'x 732, 737 (3d Cir. 2020) (finding a "close case" for reasonable suspicion on similar facts).[2] By the time Ricketts's car was searched, police had the additional incriminating information that Ricketts matched the "physical stature" of the robbery suspect and had attempted to evade police by pulling into a stranger's driveway and lying that he lived there. (See Affidavit of Probable Cause, Exhibit 3 in response to ECF No. 89.) Counsel's prediction that a court would consider this to be probable cause was not outside the bounds of reasonable professional assistance. Although Ricketts could have made arguments to the contrary—such as by showing photos of the

---

[2] The Government argues that a suppression motion targeted to the stop would have failed under California v. Hodari D., 499 U.S. 621 (1991), because Ricketts did not submit to authority when he pulled into a stranger's driveway and pretended to live there. See id. at 629. The Government bases this argument on Ricketts's testimony at the § 2255 hearing that he pulled into the driveway to evade police rather than submit to a traffic stop. However, the officer's statements, which would have been uncontradicted at a suppression hearing, describe a traffic stop. (See Police Criminal Complaint.)

11

"wooded area" depicting obstructions limiting the officer's ability to see Ricketts as claimed—it was counsel's prerogative to weigh those facts against countervailing considerations, and Ricketts has not demonstrated that her resolution was unreasonable.

Furthermore, counsel was legitimately concerned that litigating a suppression motion risked the Government not holding its 25-year offer open until the day of jury selection. Ricketts was charged with four violations of § 924(c), each of which carried a mandatory sentence of 7 years to life, and had confessed to an additional seven. The 25-year offer involved a plea to just one of those § 924(c) charges. Even if evidence from one of those robberies (the M&T bank) were suppressed, Ricketts would still be facing far in excess of 25 years.[3] The prosecutor had reminded Ricketts's counsel that the time for leaving the offer open would have to end, and it was reasonable for Ricketts's counsel to avoid hastening that date.

Finally, I credit counsel's testimony that Ricketts wanted a plea to a "reasonable amount of time." Litigating a suppression motion would not have helped Ricketts obtain a plea below 25 years because the Government still had three other armed robberies and § 924(c) charges to bargain with. Counsel therefore reasonably concluded that filing a suppression motion did not advance Ricketts's stated goals for the representation, irrespective of Ricketts's decision about whether to proceed to trial.

For these reasons, counsel's performance was not deficient, and Ricketts's claim for ineffective assistance of counsel will be denied.

---

[3] Because these events occurred before the 2018 amendment as part of the First Step Act, three of Ricketts's § 924(c) charges may have counted as "second or subsequent conviction[s]," resulting in an 82-year mandatory minimum. Deal v. United States, 508 U.S. 129, 132 (1993).

### B. Voluntariness of Plea

Ricketts's second claim is that his guilty plea was not voluntary because trial counsel coerced it by soliciting emotional pleas from Ricketts's family members. A guilty plea may be set aside if it was "induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or … by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." Brady v. United States, 397 U.S. 742, 755 (1970) (alterations omitted). "The voluntariness of [a] plea can be determined only by considering all of the relevant circumstances surrounding it." Id. at 749.

No one threatened Ricketts into pleading guilty, and, at the time, he did not feel coerced and believed that pleading guilty was what he wanted. Nevertheless, Ricketts now believes he was coerced because the emails from his family members and conversation with his mother caused him to alter his decision. But even if Ricketts would not have pled guilty absent these requests, I nevertheless find that the decision was still his and was not coerced. The opinions of family members will naturally weigh heavily on the mind of any criminal defendant, and they are among the factors to be considered in deciding how to plead. But they do not take that decision away from the defendant: rather, it was for Ricketts alone to decide whether he wanted to give his family members the benefit of knowing him outside of prison or whether he preferred to act exclusively on his own desire to proceed to trial. See United States v. Robinson, 427 Fed. App'x 163, 167 (3d Cir. 2011).

In his post-trial brief, Ricketts approaches his coercion claim from another angle: that trial counsel did not function as "counsel" guaranteed by the Sixth Amendment because she worked against his stated goal of refusing a 25-year plea offer. Technically, this is not an argument that Ricketts was coerced but that he was deprived of his Sixth Amendment right. See McCoy v.

Louisiana, 138 S. Ct. 1500, 1509 (2018). Although the Sixth Amendment framing was not fully articulated in Ricketts's § 2255 petition, I may consider it because it does not substantially differ from Ricketts's voluntariness claim and instead merely "clarif[ies] or amplif[ies]" it. Hodge v. United States, 554 F.3d 372, 377 (3d Cir. 2009); see also Hill v. Lockhart, 474 U.S. 52, 56 (1985) (finding plea entered into without assistance of counsel to be not "voluntary").

"[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." McCoy, 138 S. Ct. at 1505. In McCoy, the defendant faced three capital charges of first-degree murder; his appointed counsel viewed the prosecution's evidence as overwhelming and concluded that the only way to avoid the death penalty was to admit guilt and plead for mercy. Id. The defendant strenuously objected and maintained his innocence, but, at trial, defense counsel admitted to the jury that "my client committed three murders." Id. at 1506-07.

The Supreme Court held that McCoy's Sixth Amendment right to counsel was violated. "[T]he Sixth Amendment … speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." Id. at 1508 (quotation marks omitted). Thus, "[w]hen a client expressly asserts that the objective of 'his defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." Id. at 1509; see also id. ("Presented with express statements of the client's will to maintain innocence, … counsel may not steer the ship the other way."). To do otherwise contravenes the Sixth Amendment. Here, Ricketts argues that his trial counsel violated his autonomy when she solicited emails from his family members encouraging him to accept the Government's 25-year offer despite his expressed intent to proceed with trial.

14

I find that trial counsel did not deprive Ricketts of autonomy or coerce his decision to plead guilty. "Encouraging a guilty plea pretrial … is not equivalent to imparting to a defendant counsel's strategic determination to concede guilt should trial occur." McCoy, 138 S. Ct. at 1506 n.2. Ricketts's trial counsel never took away his ultimate authority to accept or reject the Government's offer. What she provided was strong persuasion, but based on true facts about how his family cared about him and wanted him to have a life after prison. A lawyer does not deprive a client of autonomy by "explaining why, in her view, conceding guilt would be the best option" McCoy, 138 S. Ct. at 1509. In fact, counsel has a duty to offer such advice. See id.

Ricketts makes no argument that counsel persuaded his family members to express views they did not already or genuinely hold. Nor does Ricketts dispute the accuracy of counsel's assessment that heading to trial carried an almost certain risk of a sentence far in excess of 25 years. While counsel clearly had a desired outcome in mind when she approached Ricketts's mother, it was based on Ricketts's own stated preference for obtaining a plea to a "reasonable amount of time" over asserting his innocence, and I credit counsel's testimony that she was acting to further that goal, not a personal goal of her own. Confronting Ricketts with the reality that his family desperately wanted him not to spend the rest of his life in prison did not deprive Ricketts of autonomy. Ricketts's claim that his plea was coerced will therefore be denied.

**IV.   CONCLUSION**

For the reasons set out above, Ricketts's motion to vacate his sentence and conviction will be denied.

A certificate of appealability will not be issued as to Ricketts's claim that trial counsel's performance was deficient for failing to file a motion to suppress because "reasonable jurists [would not] debate whether … [this claim] should have been resolved in a different manner or that

15

the issues presented were 'adequate to deserve encouragement to proceed further[.]'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).

I will issue a certificate of appealability as to Ricketts's coercion claim. The Government has not cited, and I have not found, any controlling authority factually similar to what occurred here, and I therefore determine that this claim "deserves further proceedings." <u>See</u> <u>United States v. Cole</u>, No. 04-cr-109, 2010 WL 1135734, at *1 (W.D. Pa. Mar. 19, 2010).

An appropriate order follows.